1825.
JUNE.

Beall
vs
Lynn

BEALL's Lessee vs. LYNN.

APPEAL from *Washington* county court. Ejectment for two tracts of land, one called *Walnut Bottom*, and the other *The Brothers*, or *The Resurvey on the Brothers*, brought in *Allegany* county court, and transmitted to *Washington* county court, on the suggestion and affidavit of the lessor of the plaintiff that a fair and impartial trial could not be had in the former court. The defendant, (the appellee,) took defence for a tract of land called *George's Adventure*, and for one called *Crooked Meanders Resurveyed*, as by him located on the plats.

1. At the trial, the plaintiff offered in evidence the plats and explanations returned in this cause, and offered evidence that the locations thereon by him made, were truly made. The defendant then offered in evidence the same plats and explanations, and that the locations thereon by him made were also truly made. The plaintiff then offered in evidence a grant for the tract called *Walnut Bottom*, located on the plats, formerly lying in *Prince George's* county, but then lying in *Frederick* county, made to George *Mason* on the 25th of March, 1756. He also gave in evidence that the lessor of the plaintiff, and those claiming under him, had been in the possession of *Walnut Bottom* ever since the year 1783, and continually exercised acts of ownership over it, erected buildings thereon, cleared and cultivated it, and sold a part, and laid out the town of *Cumberland* on it in 1785; and offered in evidence the locations and explanations of the defendant on the plats. The plaintiff then, in order to show title in himself to this tract, offered in evidence a deed for it from *George Mason*, the patentee above mentioned, to the lessor of the plaintiff. This deed is stated to have been made on the 25th of October 1783, between *George Mason*, of *Fairfax* county, in the commonwealth of *Virginia*, of the one part, and *Thomas Beall*, of *Samuel*, of the county of *Washington*,

Under the act of 1766, ch. 14, s. 4, one justice of the peace has no authority to take the probate of a letter of attorney for the acknowledgment of the deed of a nonresident grantor.

Nor has he any such authority under any other act of assembly, or under the common law.

The probate before mentioned under the said act of 1766, must be either in the provincial or county court, or before one justice of the provincial court, or *two* justices of the county court, where the land lies.

The safest course is to prove the letter of attorney before the same persons who take the acknowledgment of the conveyance; and *quere*, whether it is not the only course?

A deed of a nonresident grantor, acknowledged by an attorney under a letter of attorney proved before *one* justice of the peace only, is invalid.

If possession has gone with such a deed, yet if a plaintiff in ejectment produces the deed as evidence of his title, there can be no presumption that the same was legally executed and acknowledged, tho' if it was not produced, a legal conveyance might be presumed.

If a party objects to the competency of a witness offered on the adverse side, and the court sustain the objection, and the party making it, afterwards waives it, and consents that the witness be examined, the party offering the witness has no right to require of the court to decide that he is competent independent of the waiver of the objection.

A certificate of a clerk of a county court, that the two persons, before whom a deed purports to be acknowledged, were at the time of such acknowledgment and still are "*two justices of the peace* for the county aforesaid, and to all certificates given by them *as such*, due faith and credit is and ought to be given, as well in courts of justice as thereout," is a sufficient certificate to authorise the recording of the deed among the records of the county in which the land conveyed by such deed lies:

A mixed possession will not prevent the presumption of a deed, unless the same is held by both parties claiming title to the same land.

Where a plaintiff in ejectment produces a patent to B for the land for which he sues, dated in 1774, and produces a deed for the same land from C to F, dated the 7th of November 1785, containing *a recital of a deed* also for the same land; from B *the patentee, to* C, and proved a possession in C, of a part of said land, until 1785, and in F, claiming under him, and in the lessor of the plaintiff claiming under F, and all claiming to hold such possession under a title to the whole tract, a conveyance from the patentee to C, may be presumed,

in the state of *Maryland*, whereby, ir consideration of the sum of £1407 10 current money, *Mason* conveyed to *Beall* a tract of land called *Walnut Bottom*, and also a tract of land called *Lime Stock Rock*, the former tract granted to the said *Mason* on the 25th of March 1756, and the latter to *Daniel Cresap* on the 10th of August 1753. Annexed to this deed was a letter of attorney, executed by *Mason* on the 25th of October 1783, in the presence of three witnesses, authorising and empowering *Alexander Clagett* and *Daniel Cresap*, junior, of *Washington* county, or either of them, in his *(Mason's)* name to acknowledge the said deed according to law. On the 30th of October 1783, in *Montgomery* county, *Samuel Brooke Beall* of the said county, one of the subscribing witnesses to the above letter of attorney, made oath before *Richard Thompson*, that he saw *George Mason* sign, seal and acknowledge, the above power of attorney, as his act and deed, and also that he saw *William Mason* and *John Mason*, (the other subscribing witnesses,) sign their names as witnesses thereto, &c. The clerk of *Montgomery* county court, on the 30th of October 1783, certified under the seal of the court as follows: "that *Richard Thompson*, esquire, before whom the above probate is taken, and who has thereto affixed his signature, was at the time of taking and affixing the same, and still is, one of the justices of the peace for the county aforesaid, legally authorised and assigned, and to all probates, &c. by him so signed, due faith and credit is and ought to be given, as well in justices court as thereout." On the 8th of November 1783, the deed was acknowledged by "*Alexander Clagett*, attorney for the within mentioned *George Mason*, and by virtue of the authority in him vested by the power of attorney," before two justices of the peace for *Washington* county, to be the act and deed of the said *Mason*. To the admissibility of this deed, the defendant objected; and the court, [*Buchanan*, Ch. J. and *T. Buchanan*, A. J.] sustained the objection, and refused to suffer it to be read in evidence. The plaintiff excepted.

2. The plaintiff then offered in evidence a grant of a tract of land called *The Brothers*, lying in *Frederick* county, issued to *Thomas French*, (being a resurvey on *Walnut Bottom*,) on the 29th of November 1774. And also a deed from *James Clarke*, of *Baltimore Town* and county, to *Abra-*

ham *Faw*, of *Frederick Town* and county, dated the 7th of November 1785, for the said tract of land, reciting that "Whereas the aforesaid *James Clarke* is seized in his demesne as of fee and right, of and in a tract or parcel of land situate, lying and being in *Washington* county, called *The Brothers*, containing by estimation nine hundred and forty-three acres of land, which said tract of land was conveyed to the aforesaid *James Clarke* by a certain *Thomas French*, on the twenty-third day of October one thousand seven hundred and seventy-nine, as per his deed will appear, and was granted to the said *Thomas French* by the proprietor of the then province of *Maryland*, by virtue of a proclamation warrant, as per his patent will appear, bearing date the twenty-ninth day of November one thousand seven hundred and seventy-four, reference being thereunto had: And whereas the said *James Clarke* hath bargained and contracted with the above named *Abraham Faw*, for the sale of the above said tract or parcel of land, for the sum of two thousand seven hundred pounds current money. Now this indenture witnesseth," &c. This deed was acknowledged by *Clarke*, in *Baltimore* county, on the day of its date, before *Isaac Vn. Bibber* and *Thomas Russell*, stating themselves to be two of the justices of the peace for the county aforesaid; and annexed to it was a certificate of the clerk of the county court of *Baltimore*, certifying "that *Isaac Vn. Bibber* and *Thomas Russell*, gentlemen, before whom the above acknowledgment was made, and who have thereunto subscribed their names, were at the day of the date thereof, and still are, two justices of the peace in and for the county aforesaid, and to all certificates, by them given as such, due faith and credit is and ought to be given, as well in courts of justice as thereout." He also offered in evidence a deed from *Abraham Faw* to *Thomas Beall*, the lessor of the plaintiff, for the said tract of land, dated the 24th of September 1810, and stated to be made "between *Abraham Faw*, of the Town of *Alexandria*, in the District of *Columbia*, of the one part, and *Thomas Beall*, of *Samuel*," &c. reciting, that *Faw* was seized in fee simple of and in a tract of land situate, lying and being, in *Allegany* county, contiguous and adjacent to the Town of *Cumberland*, called *The Brothers*, or *The Resurvey on the Brothers*, which was conveyed to the said *Faw* by *James Clarke*, of *Baltimore* county, by deed dated

the 7th of November 1785, and which was conveyed to the said *Clarke* by *Thomas French*, then also of *Baltimore* county, by deed dated the 23d of October 1779, and which tract was granted to the said *French* on the 29th of November 1774, &c. This deed was acknowledged on the 24th of September 1810, before the mayor of *Alexandria*, who certified the fact under the seal of the corporation. Annexed to the deed was a letter of attorney executed by *Faw* on the 24th of September 1810, authorising *Roger Perry*, esquire, of *Cumberland*, for him, and in his name and stead, to make any acknowledgment required by law for the full execution of the said deed; which letter of attorney appeared, by the certificate of the mayor of *Alexandria*, to have been acknowledged before him by *Faw* on the same day. On the 26th of September 1810, in *Montgomery* county, *Thomas L. Maccubbin*, one of the subscribing witnesses to the letter of attorney, appeared before a justice of the peace of that county, and made oath that he saw *Faw* sign and acknowledge the letter of attorney to be his act and deed. The clerk of *Montgomery* county court certified, under his hand and seal of the court, on the 26th of September 1810, that *Jesse Leach*, gentleman, before whom the above probate appeared to have been made, and whose name was thereto subscribed, was at the time a justice of the peace in and for the county aforesaid, duly commissioned and sworn. On the 2d of October 1810, before two justices of the peace in and for *Allegany* county, "*Roger Perry*, of *Cumberland*, named in the foregoing power of attorney, the execution whereof hath been duly proved, and by virtue and in pursuance of the authority thereby given," acknowledged the annexed deed to be act and deed of *Abraham Faw*, &c. The plaintiff then offered to prove by a certain *George Hoffman*, that the aforesaid *James Clarke* was in possession of the aforesaid tract called *The Brothers*, from the year 1779 to the year 1785, holding and claiming the same as his own. That the aforesaid *Abraham Faw*, after the deed aforesaid made to him, entered upon the said land, and held and possessed the same as his own, claiming under the said deed to him, until he sold to *Beall*, the lessor of the plaintiff, and that from the time of the said last mentioned sale, the lessor of the plaintiff, and those claiming under him, have held and possessed the said land, claiming

1825.

Beall
vs
Lynn.

and holding the same as their own under the said deed. The defendant then offered in evidence, from the plats, and explanations, that the plaintiff had located a deed from the lessor of the plaintiff to said *Hoffman*, for part of a tract of land called *The Brothers*, held by the witness under the lessor of the plaintiff, but which part was clear of all dispute as to the location of the tract, and objected that said *Hoffman* was not a competent witness for the plaintiff, to prove the possession herein before stated, and offered by the plaintiff to be proved by him. The court [*Buchanan*, Ch. J. *Shriver*, and *T. Buchanan*, A. J.] sustained the objection, and refused to let the said testimony go to the jury. To this opinion the defendant prayed leave to except. When the exception was prepared and ready to be signed by the court, the defendant's counsel withdrew all objection to the competency and credibility of the said witness, which might arise from the opinion of the court, or from any other cause. The court were then of opinion, that said witness, independent of the admissions, above stated, of the defendant's counsel, was competent to prove the facts offered by the plaintiff to be proved by him. The plaintiff, by his counsel, refused, under the opinion above stated, to examine the witness to the facts to which he had been declared incompetent by the court, in the opinion first herein before stated, and prayed the opinion of the court that said witness was competent to prove said facts. Which opinion the court refused to give, being of opinion, that without such admission said witness would not be competent; and further, that it was immaterial and unnecessary to decide on the competency of said witness, after all objections to him had been withdrawn by the defendant, and an offer made that the witness should be sworn to the jury without any prejudice to his testimony from the opinion first expressed by the court. The plaintiff excepted.

3. The plaintiff then offered to swear *James Hook* as a witness, to prove the possession of *The Brothers* by the lessor of the plaintiff, and those claiming under him, for twenty-five years before the bringing of this suit, and that the said tract, *The Brothers*, and the tract called *Walnut Bottom*, as located on the plats, were correctly located by the plaintiff. The defendant objected to the admissibility of this witness, and read in evidence a deed from the lessor of the plaintiff to *John S. Hook*, dated the 16th of April 1816, which is located on the plats, being for

a part of the tract called *The Brothers*, and beginning in the seventeenth line of *Walnut Bottom*. And then swore said *Hook* on his *voir dire*, who stated that he did not know whether or not he was interested in the event of this cause, or would gain or lose by the event of it; that he had purchased of his father, *John S. Hook*, part of the land mentioned in the aforesaid deed, and paid for the same, and that the part he purchased is free from this dispute as respects the location of the land. That his father has promised if the land in dispute should be recovered, that he will sell it to him, but if it is not recovered, he is not to have it, and not to pay for it; that his father's promise is a verbal one, but that he believed if his father lives that he will fulfil his promise. The court were of opinion that the witness was incompetent, and refused to suffer him to be sworn to the jury. The plaintiff excepted. After this opinion was given, and the plaintiff had prayed leave to except, the defendant withdrew all objections to the competency or credibility of the witness, that could arise from the opinion of the court, or from any other cause, and offered to permit him to be sworn to the jury, and the court were thereupon of opinion, and so directed, that he might be sworn to the jury. But the counsel for the plaintiff refused, under such an opinion from the court, to swear the witness to the jury, and prayed the opinion of the court that the witness was competent for the purpose for which he was offered, independent of any admissions made by the defendant. This opinion the court refused to give, being of opinion, that without such admission he would not be competent, and further, that it was immaterial and unnecessary to decide on the competency of the witness, after all objections to him had been withdrawn by the defendant, and an offer made by him that the said witness should be sworn to the jury, without any prejudice to his testimony from the opinion first expressed by the court. The plaintiff excepted.

4. The plaintiff then offered in evidence, by *Benjamin Wiley*, a competent witness, that the witness knows the tract of land called *The Brothers*, and lived on it in 1782. In 1782 *The Brothers* was all in woods. *James Clarke* lived in *Baltimore*, and claimed title to the land as his own, and agreed to lease a part of it to the witness, who went on the land in the summer of 1782, under that agreement, and cleared about an acre, and fenced it in and built a

cabin near the lines of *Walnut Bottom*; but after seeing the lines run, and finding the lines of *Walnut Bottom* then held by *George Mason* took in part of the land he expected to lease, he refused to take the lease, and left the land, and went to *Baltimore*, after having remained on the land eight or ten months. Witness lived in *Baltimore* from 1783, at which time he left *The Brothers* until 1787, when witness again returned with his family. He lived in *Virginia*, about two and a half miles from *Cumberland*. In 1782 the witness understood from *James Clarke* and *Charles Clinton*, that the latter was agent for *Clarke*, and had the care of *The Brothers*, as agent of *Clarke*; at that time *Clinton* lived on *Walnut Bottom*, where the town of *Cumberland* now stands, and it was *Clinton* who pointed out to him the land he was to lease from said *Clarke*, as before stated, and part of which was found on survey to be in *Walnut Bottom*. In 1785 witness went to *Cumberland*, *Clinton* was then gone. He does not know who at the time had the care of *The Brothers*, and thinks no body was living on it. *Clinton* left *Cumberland* in 1783. In 1788 or 1789, *David Watkins* cleared a field on *The Brothers*, and held the same some years, claiming under *Thomas Beall*, the lessor of the plaintiff. From some time between 1790 and 1795, to this time, *Beall*, and those claiming under him, have been in the actual possession and occupation of different parts of that part of *The Brothers* lying to the east of *Wills* creek, by cutting timber and clearing when it suited him, and leasing out and selling parts of the said tract to different persons, *Beall* claiming at the same time title to the whole tract as having been purchased by him from *Faw*, except where he *Beall* had sold out parts of it. Witness knows nothing as to the possession on the west side of *Wills* creek, between 1795 and 1800. *James M'Coy* cleared a field, claiming under *Beall*. On the cross examination by defendant, witness stated, that about twelve years ago he saw some of the lines of *The Brothers* run, one of them run into the field of Colonel *Lamar*, who never claimed or held any of his land, under the title of *The Brothers*, to the knowledge of the witness. This running was made by order of the court. The plaintiff then offered in evidence, by *Michael Fisher*, a competent witness, that he went to live in *Cumberland* in 1792, and has known the land called *The Brothers* from that time,

although he did not know by what name it was called until 1795. Beall was in the practice of exercising acts of general ownership over that part of the land on the east side of Wills creek, by cutting timber on it, and permitting others to cut timber in different places, cultivating some of it, and renting out other parts, and claiming title to the whole tract. The witness does not know the lines of The Brothers on the west side of Wills creek, located on the plats, and does not know who possessed that part, except the town of Cumberland, which was laid out by Beall, then part of the meadow land on this tract was enclosed and improved by Beall, and has since been enclosed by him. The plaintiff further offered in evidence, by Dickinson Simkings, a competent witness, that he has known the land called The Brothers for about fifty years. Witness went to live in the neighbourhood of the land about 1771, and has lived in that neighbourhood ever since. About twenty-six or twenty-seven years ago, Beall laid off an addition to Cumberland on the tract called The Brothers, on the east side of Wills creek, and sold out the lots to different persons, Beall at the same time claiming title to the whole tract as purchased from Abraham Faw, except where he had sold out parts of it. Ever since that time, that is for 26 or 27 years, Beall has been in the habit of exercising acts of general ownership over The Brothers, on the east side of Wills creek, by cutting timber on it in different places, selling, renting and improving, different parts, and claiming title to the whole tract. The witness does not know the lines of The Brothers on the west side of Wills creek, and does not know of any acts of ownership by Beall on the west side. The witness does not know whether or not Clarke or Faw was ever in possession of The Brothers, it was in woods when the witness first knew it, and very little improvement was made on it until Beall got it. The plaintiff further offered in evidence, by William M'Mahon, a competent witness, that in the year 1799 The Brothers stood assessed to Abraham Faw, and that Beall paid the taxes on it. Witness was collector of the taxes from 1799 until 1804, and until that time Beall paid the taxes. He does not know to whom it was assessed, or who paid the taxes before 1799. The witness, on his cross examination by the defendant, stated that he has known a particular field, located on the plats near the

turnpike road, and running, &c. to be enclosed by a fence, and in the possession of the defendant, and cultivated by him since some time between the year 1796 and 1799, to the present time; also that he has known another field, also located, to be enclosed and cultivated, and possessed by the defendant, since the year 1801, and he thinks for one or two years before; also that he has known a third field, also located, to have been enclosed in the year 1804, and possessed by the defendant; he thinks it was enclosed before, but how long does not know. It has not been kept continually enclosed since the year 1804, the fence was taken away, and rails put in pens round some fruit trees that had been planted there by the defendant, who claimed it as his own. Since the year 1804 the fence has been again replaced by the defendant, and is now in his possession. The greater part of these three fields were cleared by the defendant. He began to cut timber on the first field about the year 1796, and continued to cut, clear, and enclose in all the fields, until they were all cleared and enclosed as herein before stated. The lines of the field, first mentioned in the testimony of this witness, includes a part of *Walnut Bottom* and a part of *The Brothers*. Part of said fields the defendant claims title to under the witness, who bought it of the lessors of the plaintiff in the year 1795, as a part of *Walnut Bottom*; another part is held and claimed by the defendant, as part of *George's Adventure*; another part as a vacancy taken up by defendant. The name of the land so taken up the witness does not know. When witness bought of *Beall* in the year 1795, he proposed to purchase all the land included in *Walnut Bottom*, on the west side of the town of *Cumberland*, and agreed to give him $13 per acre for all that part of *Walnut Bottom*, to which the plaintiff agreed. Witness bought the land as agent for the defendant, and at his request. The witness told *Beall* to have the deed prepared; when the deed was about to be executed, *Beall* said he was afraid there was some mistake in it, and if there was more land in *Walnut Bottom* than was contained in the deed, and found to be so on a particular survey, that the witness must pay him for it, to which the witness agreed. The money was paid, and the witness obtained a deed from *Beall*, which was offered in evidence, dated the 7th of November 1795. The witness afterwards conveyed said land to *Lynn*;

1825.

Beall
vs
Lynn

*Lynn* went into possession of the land soon after the deed to the witness; witness lives in sight of the fields before mentioned by him, and knows of no act of ownership or possession by *Beall*, on any part of the said fields, since the deed to the witness, except occasionally surveying said lands, on disputes between the plaintiff and defendant in *Allegany* county court about the location of their lands. If any part of the fields before mentioned by witness, are included in *George's Adventure*, then the defendant had possessed such part of *George's Adventure*, in the manner before stated. Witness knows another field, which he described; some part of that field was enclosed about 25 or 26 years ago by *Zachariah Magruder*, as a part of *George's Adventure*, but the part so included is not located on the plats. *Zachariah Magruder* from the year 1792 until his death, which happened in the year 1798, or thereabouts, exercised acts of general ownership over the tract called *George's Adventure*, by cutting timber in different places, claiming and cultivating in others, and claiming title to the whole tract; and about 12 or 13 years ago the defendant entered into *George's Adventure*, claiming under the heirs of said *Magruder*, and has ever since exercised acts of general ownership over the said land, by cutting timber and wood, clearing and cultivating different parts, and claiming title to the whole; the heirs of *Magruder* exercised the same sort of ownership over the said land from his death, until the possession was transferred to the defendant. The plaintiff further offered in evidence by *Beall Howard*, esq. a competent witness, and one of the counsel for the plaintiff, and residing in *Allegany* county, that in 1816 or 1817, witness made a diligent search among the records in the office of the court of appeals, with the assistance of the clerk of that court, for a deed from *Thomas French*, the patentee of *The Brothers*, to *James Clarke*, for *The Brothers*, but without success; and in 1817 or 1818, he made a like search among the land records of *Frederick* county court, but could find no such deed, and could find no deed of any kind from *Thomas French* to *James Clarke* on said records. The plaintiff further offered in evidence, by ――― *Myers*, a competent witness, that the witness is a clerk in the office of the clerk of *Washington* county court, and transacts the greater part of the business of that office; he has been 12 years a clerk in the office, and is familiar with

HARVARD LAW SCHOOL LIBRARY

1825.
Beall
vs
Lynn

its business.  He diligently searched the records of *Wash-ington* county court, from the beginning of them, to the 7th of November 1785, for a deed from *Thomas French* to *James Clarke*, for the tract called *The Brothers*, and could find no such deed on the land records.   The records of deeds in *Washington* county begin in 1777, he can find no deed of any kind on those records from *Thomas French* to *James Clarke*.    The defendant then offered in evidence, by *Roger Perry*, esq. a competent witness in this cause, that the witness went to *Cumberland*, in *Allegany* county, in the year 1794, to reside, and has resided there ever since. That the field first mentioned in the evidence of *William M'Mahon*, herein before stated, was cleared, and the wood cut off of it in the winter of 1795; and was enclosed in the spring of 1796, by the defendant, and has remained in his possession ever since.   That the second field, also men-tioned in the testimony of *William M'Mahon*, was enclos-ed, as the witness thinks, in 1797, but that he is certain it was enclosed in 1798, and in the possession of the defend-ant; and has continued to be in his possession, by enclo-sure, ever since.   That the third field, mentioned in the said testimony of *M'Mahon*, was enclosed by the defend-ant about the year 1799 or 1800, and an orchard planted on it.   That about two years after the first enclosure of said field, the fence, or a part of it, was taken down to se-cure the fruit trees which had survived the ravages of the locusts, and as the orchard had never been cultivated,  a great number of brushes grew up; the field was thrown open, and remained open from four to six years, when it was again enclosed by the defendant; and still remains in his possession by enclosure and cultivation.   That part of the last field, mentioned in the testimony of *M'Mahon*, not included within *George's Adventure*, was enclosed by *Lynn* in 1796, and has remained in the possession, by enclosure and cultivation, of *Lynn*, to the present time.   That part of the last field, included within the lines of *George's Ad-venture*, when the witness first knew it in the fall of 1794, except a small part of it, was enclosed and in the posses-sion of *Zachariah Magruder*, and remained in his posses-sion until his death.   *Zachariah Magruder* resided on and exercised general acts of ownership over *George's Adven-ture*, by cutting timber, and cultivating parts of it.  About the year 1798 *Magruder* died, and his heirs remained in

possession until about the year 1802, when *David Lynn* purchased the said land of a trustee appointed by the chancellor for the sale of the interest of the said heirs, and *Lynn* then entered into possession as aforesaid, and about the year 1802 enlarged his enclosure of that field, and has remained in its possession, by enclosure, from that time to the present. *Lynn* claims the land described above, and for which he has taken defence, part as within the lines of *Crooked Meanders* and *Crooked Meanders Resurveyed*, part as *Walnut Bottom*, purchased by *William M'Mahon* of *Thomas Beall*, and part as *George's Adventure*. The defendant further offered in evidence the patent for the tract called *George's Adventure*, located on the plats granted to *George French* of *Thomas*, on the 21st of April 1775. And also the patent for *Crooked Meanders*, granted to the defendant on the 19th of November 1790.

The plaintiff then prayed the direction of the court to the jury, that if they believed the evidence given by the plaintiff and the defendant, that they might presume that *Thomas French*, the patentee of the tract called *The Brothers*, conveyed said tract to *James Clarke* before the 7th of November 1785. Which direction the court refused to give. The plaintiff excepted, and the verdict and judgment being against him, he appealed to this court.

The cause was argued at the last June term, before EARLE, MARTIN, STEPHEN, and ARCHER, J.

*Taney*, for the Appellant, contended, upon the *first* bill of exceptions, that the deed from *Mason* to *Beall*, the lessor of the plaintiff, ought to have been admitted in evidence—1. Because the execution of the power of attorney, by virtue of which the deed was acknowledged, was legally proved. 2. Possession having gone with the deed since 1783, it may and ought to be presumed that said power was proved before one having competent authority to take the probate.

Upon the *second* and *third* bills of exceptions, he contended, 1. That the witnesses therein named could not gain or lose by the event of the suit, and therefore were competent; and 2. If they were competent witnesses, the subsequent assent of the defendant to admit the evidence, cannot remove the error of the decision, because the opinion of the court would necessarily induce the jury to

receive the evidence of such witnesses with suspicion and distrust.

Upon the *fourth* bill of exceptions, he contended, 1. That the facts stated show the possession of *Beall*, and those claiming under him, from the year 1782, and that upon that proof, and the other evidence stated in the record, the court ought to have directed the jury that they might presume the deed from *French* to *Clarke*. 2. That the evidence offered by the defendant, of a conflicting location of another tract of land with *The Brothers*, and of possession of parcels of land within the lines of *The Brothers*, claiming such possession under an adverse title, although it is evidence against the location of *The Brothers*, claimed by the plaintiff, is not evidence to rebut the presumption of title to *The Brothers*.

On the points under the *first* bill of exceptions, he referred to the act of 1766, *ch.* 14, *s.* 4. *Ricard vs. Williams*, 7 *Wheat.* 109, 110. *Bryden vs. Taylor*, (June 1809.) *Hall vs. Gittings's Lessee*, (June 1809.)

On the points under the *fourth* bill of exceptions, to *M'Comas vs. Bradford*, (December 1813,) and *Gittings's Lessee vs. Hall*, 1 *Harr. & Johns.* 27.

*Harper* and *Speed*, for the Appellee, on the *first* bill of exceptions, also referred to the act of 1766, *ch.* 14, *s.* 4, *Sim & Lee's Lessee vs. Deakins*, 2 *Harr. & M'Hen.* 46. and *Hall vs. Gittings* (June 1809.)

On the *fourth* bill of exceptions, to *Gittings's Lessee vs. Hall*, 1 *Harr. & Johns.* 27. *Cockey's Lessee vs. Smith*, (June 1810,) and *Mundell's Lessee vs. Clerklee* (December 1814.)

*Curia adv. vult.*

At this term the opinion of the court was delivered by

MARTIN, J. This was an action of ejectment, instituted to recover two tracts of land, the one called *Walnut Bottom*, the other *The Brothers*, or *The Rusurvey on The Brothers*. The plaintiff having shown a title to *Walnut Bottom* in the patentee, *George Mason*, offered to read in evidence to the jury a deed from him to *Thomas Beall*, the lessor of the plaintiff, but the court were of opinion the deed was not legal evidence, and it was rejected.

It appears from the record, that at the time the deed from *Mason* was executed, *Walnut Bottom* was in *Washington*

1825.

Beall
vs
Lynn

county, and the grantor was a nonresident of this state, and resided in *Virginia.* That the deed was not acknowledged by *Mason* in person, but by his attorney, and that the letter of attorney, giving authority to make the acknowledgment, was proved before *Richard Thompson,* who is stated to be a justice of the peace for *Montgomery* county.

It was contended, that this deed could have no legal operation—1st. Because *one* justice of the peace had no authority to take the probate of the letter of attorney, and therefore it was not well and sufficiently proved according to law. 2d. If *one* justice of the peace had authority to take probate of its execution, it does not legally appear that *Richard Thompson,* before whom this probate was made, had authority to administer an oath, the clerk not having certified that he was duly *commissioned and sworn.*

The privilege of acknowledging a deed *by attorney,* was conferred by the act of 1766, *ch.* 14, and we must have recourse to that act to see if the letter of attorney was well and sufficiently proved, according to the meaning of the legislature. After declaring how deeds shall be acknowledged and enrolled, where the grantor resides within the state, the *fourth* section points out the course to be pursued, where the grantor is a nonresident of the state. It declares "that a deed made by a nonresident of the state shall be acknowledged by letter of attorney, well and sufficiently proved, either in the provincial court, or county court where the land intended to be conveyed, or the use thereof limited or declared, doth lie, or before *one* justice of the provincial, or *two* justices of the county court, as aforesaid."

It is perfectly clear that the tribunal or persons before whom the acknowledgment is made, may have the witnesses to the letter of attorney brought before them, and if they are satisfied of the due execution of the power, take the acknowledgment. Whether it must be proved before the *same* persons who take the acknowledgment, or may be proved before one of the tribunals mentioned in the act of 1766, and be acknowledged before another, as for instance, proved before one provincial justice, and acknowledged before another provincial justice, it is not necessary for us now to decide. The question presented by the *first* bill of exceptions is, whether *one* justice of the peace had authority to take the probate? 

This act of assembly, giving a new remedy, and confer-

ring a special authority, ought perhaps to receive a strict construction; but if we give the most liberal effect to the words "well and sufficiently proved;" they must mean, proved according to law, that is, proved in the manner expressly required by the act of 1766, or before some person or tribunal authorised to take its probate, independent of that act. It must be conceded, that one justice of the peace is not empowered to take the probate, *by the express words of the act*, for no authority is *expressly* given to *one* justice of the peace to do any act whatever by that law. Where a justice of the peace is mentioned, the law always requires the co-operation of *two* of them; thus the acknowledgment is to be made, not before *one* but *two* justices of the peace. If the legislature meant to invest *one* justice with power to take the probate, why not also give *one* authority to take the acknowledgment? It surely does not require more talents, integrity or knowledge, to take the bare acknowledgment of the deed, than to receive the testimony of the witnesses, in such a manner as to give legal effect and operation to the letter of attorney. If then this act does not *expressly* authorise *one* justice to take the probate, from whence does he derive this power? If it is by implication, still the act requires it to be "well and sufficiently proved"—that can only mean, proved before some other tribunal authorised to take the probate. How does a justice of the peace claim this right? It is not conferred on him by any other act of assembly, and we look in vain to the principles of the common law to find it. Suppose a letter of attorney had been given for any other purpose, for instance to collect debts, and it became necessary, in a trial at law, to use it, to show the authority of the agent, what would be legal evidence of its due execution? A certificate from a justice of the peace, that he had *in pais* examined the witnesses to it?—surely not—It must be proved like other deeds. The court, before whom the cause was depending, must have the witnesses before them, or in their unavoidable absence, proof of their handwriting.

The construction we give to the *fourth* section of the act is, that the letter of attorney must be proved, either before the provincial or county court, or before one justice of the provincial, or *two* justices of the county court, where the lands lie. It is certainly the safest course to prove it before the same persons who take the acknowledg-

ment. But whether that is required by the act is a ques-
tion, as before observed, not necessary now to be decided,
and on which no opinion is intended to be expressed.

Having disposed of this question, it is unnecessary to
examine the objection to the certificate of the clerk. The
deed not having been legally acknowledged, it is perfectly
immaterial whether that certificate was correct, we there-
fore pass it without remark.

It was contended, by the counsel for the appellant, that
although a justice of the peace had no authority to take
the probate of a letter of attorney, yet the jury ought to
presume, from the long possession of the plaintiff, and
those under whom he claims, that this letter of attorney
had been duly and legally proved, or in other words, that
it had been proved as required by the act of 1766. The
doctrine of presumption, from long possession, is too well
established to be called in question at this day: It is a
doctrine founded in justice, and is intended to support the
title of *bona fide* holders of land, where from accident or
casualty their title papers may be supposed to be lost. It
quiets the possession of estates, and ought to be sustained
by the courts, where a proper foundation is laid for the
presumption. But to direct the jury to presume a fact, in
direct opposition to the evidence produced and relied on
by the party, has never yet been countenanced by any de-
cision we have seen. Had the plaintiff entirely withdrawn
this defective deed, and then moved the court to instruct
the jury, they might, from the possession and acts of owner-
ship, presume a good deed, it would have presented a very
different question. In this case, the plaintiff offered in
evidence a letter of attorney, proved *in pais*, before a
single justice of the peace, and produced a record to show
it was thus proved, and yet calls on the jury to presume
it was not proved as he has established it, but in a manner
entirely different; every presumption that might have arisen
from the want or absence of proof, is here rebutted and
destroyed by the proof offered.

The *second* and *third* bills of exceptions are in principle
alike, and do indeed present an anomaly in judicial pro-
ceedings. Witnesses offered by the plaintiff were objected
to by the defendant on account of interest, and the court
decided they were incompetent. The defendant then with-
drew all objection to the competency and credibility of the

1825.

Beall
vs
Lynn

said witnesses, which might arise from the opinion of the court, or from any other cause, and the court were of opinion, and so directed the jury, that the witnesses might be examined; but the plaintiff would have them received upon his own terms, or not at all, and took exception to the procedure of the court; we see nothing in those exceptions on which this court ought to hesitate a moment. Whether the witnesses offered were competent, is not a question before us. The objection made to them was withdrawn by the defendant, and if the plaintiff had not the benefit of their testimony, it was his own fault. We sit here to administer justice, and not to settle points of punctilious etiquette between the parties.

The *fourth* bill of exceptions remains to be considered. This ejectment was instituted, as before stated, to recover two tracts of land, the one called *Walnut Bottom*, the other *The Brothers*; the defendant took defence for all the land included within the lines of a tract called *George's Adventure*, and not within the lines of *Walnut Bottom*, as located by him. Also for the land included within the lines of a tract called *Crooked Meanders Resurveyed*, as comprehended within a deed from the lessor of the plaintiff to *William M'Mahon*, and a deed from the lessor of the plaintiff to the defendant, dated the 5th day of June 1813, and for all the land located upon the plats as the possession of the defendant.

The plaintiff, to prove his title to the tract called *The Brothers*, read in evidence to the jury the patent by which it was granted to *Thomas French*, on the 29th of November 1774; he then read a deed from *James Clarke* to *Abraham Faw*, for this land, dated the 7th of November 1785, and a deed from *Faw* to the lessor of the plaintiff for the same land, dated the 4th of September 1810. Both the deeds from *Clarke* to *Faw*, and from *Faw* to the lessor of the plaintiff, contain recitals, stating that a deed for this land was passed by *Thomas French*, the patentee, to *James Clarke*, on the 23d of October 1779. This deed, however, was not produced, and evidence was given that no such deed could be found among the records. He also gave parol evidence, (*Wiley, Fisher, Simkins*, and *M'Mahon*,) to prove that *James Clarke* claimed the land called *The Brothers*, and exercised acts of ownership over it in the year 1782, and afterwards. That a tenant under him held

1825.

Beall
vs
Lynn

possession of part of the land, and cleared it. That the lessor of the plaintiff, and those claiming under him, have been in *actual* possession of parts of this land since the year 1792. That he made an addition to the Town of *Cumberland* more than 26 years before the institution of this suit, by selling out lots to different persons, from *The Brothers*, (claiming the whole tract under *Abraham Faw*,) the possession of which lots has never been disturbed. That in 1799, this land was assessed to *Faw*, and the taxes were paid by the lessor of the plaintiff. The defendant then offered evidence to show, he had been in possession of part of *The Brothers* for many years, claiming the same *not as part of The Brothers*, but as being included within the lines of other tracts of land, to which he was entitled. The counsel for the plaintiff then prayed the court to instruct the jury, if they believed the evidence given on the part of the plaintiff and defendant, they may presume a deed from *Thomas French*, the patentee, to *James Clarke*, for *The Brothers*, before the 7th day of November 1785; which instruction the court refused to give.

If all the testimony submitted to the jury was legal evidence, and the possession of the defendant was not a mixed or conflicting possession, so as to affect the title of *The Brothers*, it is difficult to imagine a case that would afford a stronger foundation to presume a deed. The court below have not stated the ground upon which they rejected the prayer, but it is contended here, by the counsel for the appellee, in defence of their opinion, that there was a mixed possession of *The Brothers* by the lessor of the plaintiff and the defendant, and therefore a deed should not be presumed on the possession of *either* against the other; and, although the deeds from *Clarke* to *Faw*, and from *Faw* to the lessor of the plaintiff, were permitted to be read in evidence to the jury, they were not *legal* evidence, and therefore ought to be rejected by this court, and without their aid, there was not a sufficient foundation to presume the deed.

If there had been a mixed possession by plaintiff and defendant, both claiming *under The Brothers*, we are not prepared to say the opinion of the court was erroneous, nor is it necessary to decide that question. But in this case it appears, that although the defendant was in possession of part of this land, he did not claim it as being part of *The*

*Brothers*, but as being included within the lines of other tracts of land to which he was entitled, and whose location interfered with *The Brothers*. (See the testimony of *Roger Perry*, who was a witness produced by the defendant and his counsel in the cause.) His possession then did not conflict with the *title* of *The Brothers*, but with its *location*. He claimed, not as the proprietor of that land, but as the owner of other tracts, whose lines took away a part of it. He might rightfully hold all the land in his possession under the other tracts, although the plaintiff had a legal title to *The Brothers*. His possession does not affect the title to *The Brothers*, but its location-only. When a mixed possession can be used, to prevent the presumption of a deed, that possession must be held by both parties, claiming *title* to the same land.

It has been urged that the deeds from *Clarke* to *Faw*, and from *Faw* to the lessor of the plaintiff, were not legal evidence, and ought to be rejected by this court. The examination of this part of the case presents two questions, 1st. Were those deeds, or either of them, legal evidence? 2d. If they, or either of them, are to be rejected, was there sufficient evidence, without the aid of the rejected deed, to support the prayer made by the counsel for the plaintiff?

The opinion of the court on the first bill of exceptions, is conclusive upon the deed of *Faw* to the lessor of the plaintiff. *Faw* was a nonresident of the state, and the deed was acknowledged by letter of attorney; the acknowledgment was made before two justices of the peace of *Allegany* county, and the letter of attorney was proved before *one* justice of the peace for *Montgomery* county, and before the mayor of *Alexandria:* Neither of them had authority to take such probate; and therefore the letter of attorney was not well and sufficiently proved. The deed from *Clarke* to *Faw* is not liable to the same objection—*Clarke* resided in *Baltimore* county; and the acknowledgment was made by him before *Isaac Vn. Bibber* and *Thomas Russell*, who state themselves to be two justices of the peace for that county; the certificate of the clerk of *Baltimore* county is in the following words: "I hereby certify, that *Isaac Vn. Bibber* and *Thomas Russell*, gentlemen, before whom the above acknowledgment was made, and who have thereunto subscribed their names,

1825.

Beall
vs}
Finn

were at the day of the date thereof, and still are, two justices of the peace for the county aforesaid, and to all certificates by them given, *as such*, due faith and credit is and ought to be given, as well in courts of justice as thereout." It is objected that this certificate is not sufficient, because it does not state the justices were *duly commissioned and sworn*. It has been decided in the second trial of *Gittings and Hall* in 1809, that these particular words are not necessary to constitute a good certificate. The words there were "*legally authorised and assigned*, and due faith and credit ought to be given to their certificates." Chief Justice *Chase* says, "the clerk is the person intrusted to make the certificate—he had knowledge of the facts whereon to ground his certificate, which is to authorise the recording the deed. The court think a substantial compliance with the directions of the act is all that is requisite, and the court consider the words of that import. The words *legally authorised* are of the same import as duly commissioned and sworn. The court consider that the justices could not be legally authorised unless they had been commissioned and sworn." In that case there were auxiliary words, not to be found in this—*legally authorised and assigned*—and the court rely on those words, not because there is any magic in them, but because they import that the justices must have been commissioned and sworn, and are therefore a substantial compliance with the act. Any other words then, which necessarily import that they were commissioned and sworn, would be as substantial compliance with the act, as legally authorised and assigned. But independent of that decision, and if the question was now for the first time before us, we think justice ought not to be perverted, and the estates of third persons defeated, by a mere clerical error in the literal observance of a form. Where the law requires the clerk to give a certificate, and he substantially complies with it, it is sufficient. This certificate states "they were justices of the peace, and that due faith and credit is and ought to be given, as well in courts of justice as thereout, to all certificates given by them *as justices*." Now what is the irresistible import of those words? If they were justices of the peace, they must have been duly commissioned, for unless duly commissioned they could not be justices; and if due faith and credit ought to be given to their certifi-

cates *as justices*, they must have been sworn, for they are not authorised to give certificates *as justices* unless they had been sworn. We consider this certificate a substantial compliance with the act, and the deed was proper evidence to be submitted to the jury.

Was there then sufficient evidence to justify the prayer of the counsel for the plaintiff, if we retain the deed from *Clarke* to *Faw*, and reject that from *Faw* to the lessor of the plaintiff? *The Brothers* was patented to *French* in 1774. In 1782, although then a great part was in woods, we find it in the possession of *Clarke*, by his tenant claiming it as his property, and exercising acts of ownership over it. In 1785 it is conveyed by *Clarke* to *Faw*, who stands assessed for it in 1799. The taxes are paid by the lessor of the plaintiff, who continues in the possession of the land, claiming it, as some of the witnesses declare, under *Faw*, from the year 1792. He adds to the town of *Cumberland*, by laying out lots from this land—he sells, leases, and disposes of those lots at his pleasure, and the possession of them remains undisturbed; and during the whole of this period, from the first possession by *Clarke*, no person set up an adversary claim to it. We think this testimony afforded a sufficient foundation to presume the deed, and that the court ought so to have instructed the jury.

We concur in opinion with the court below, on the *first*, *second*, and *third* exceptions, and reverse the judgment on the *fourth*.

ARCHER, J. The question arising on the *first* bill of exceptions taken in this cause, is as to the admissibility in evidence of the deed from *George Mason*, the patentee of *Walnut Bottom*, to the lessor of the plaintiff, dated the 25th of October 1783. *Mason*, the grantor, at the time of the execution of the deed, resided in the state of *Virginia*, and on the same day executed a power of attorney to *Alexander Claggett*, and *Daniel Cresap*, junior, empowering them, or either of them, to acknowledge the deed in his name, in conformity with the act of assembly providing for the acknowledgment of deeds in cases where the grantors resided out of the state. One of the attesting witnesses to the power of attorney appeared before *Richard Thompson*, in *Montgomery* county, and made oath to the

due execution of the power, which is certified by the said
Thompson. To this is annexed a certificate of the clerk
of Montgomery county, that Richard Thompson, at the
time when the said proof was made, was a justice of the
peace of Montgomery county, duly authorised and assign-
ed. It further appears, that the land intended to be con-
veyed by said deed, lay in Washington county, and was,
by Alexander Claggett, one of the attornies, on the 8th
day of Nov. 1788, acknowledged before two justices of the
peace for Washington county, and recorded within the
time prescribed by law. Evidence was also given on the
part of the plaintiff of his full and undisturbed enjoyment
and possession of the land described in the deed from
the date thereof to the institution of this suit, a period of
thirty years.

Two questions have been discussed in the investigation
of this subject.

1st. Whether the power of attorney is well and suffici-
ently proved in conformity with the act of 1766, ch. 14?
And

2dly. Whether presumption, from length of possession,
can be called in aid of the defect, if one exist?

It has been urged by the counsel for the defendant, that
the power of attorney must be proved either before the
justices who take the acknowledgment, or before some jus-
tice of the county where the land lies. To give the con-
struction to the act, first contended for, would violate every
rule of interpretation. It was obviously the intention of
the legislature to designate alone where deeds should be
acknowledged, and where recorded, and not to limit the
place where, or the persons before whom the proof should
be made. It was further the intention of the legislature,
in their enactment of the fourth section of the law of 1766,
ch. 14, to facilitate the means by which nonresidents might
transfer their lands, and to obviate the difficulties which
existed in the transfer of landed property in cases not pro-
vided for by the act of 1715. Viewing it in this light,
the most liberal construction, to effectuate the object of
the legislature, should be given to the section. To confine
the proof of the power to the county where the land lies
would, if it did not multiply difficulties to the nonresident
grantor in the transfer of his landed property, at least leave
him where it found him. It certainly would be wholly im-

material where the proof was made, provided it was made before any person having power by law to administer an oath. The object of the legislature, in requiring proof of the power, was certainly salutary, but why should we confine the proof to be made in the county where the land lies, when by so doing no object, beneficial to the parties, could be attained, and a strained construction would have to be given to the law, and when this strained construction would involve the legislature in the just imputation of this absurdity, that they considered an oath more obligatory when made in one place than another.

The affidavit made by the subscribing witness to the power, has been considered as *entirely voluntary*, inasmuch as it was made out of the county where the land lies; but this presupposes the fact, that either the proof was not required to be made, or that the justice of *Montgomery* had no power to administer the oath, both of which propositions are considered equally groundless. It has also been urged, that the justice possessed neither a special or general jurisdiction, as it regards the administration of oaths in proof of the power. I consider the act of 1766 as requiring the proof, and not designating before whom it shall be taken. In such a case there is certainly a power impliedly granted to *all* justices of the peace, and other judicial officers, to take the proof required. If it be once admitted that the proof is not limited to be taken in the county by the act of assembly, and surely such is the only rational construction, it would seem necessarily to follow, that justices of the peace any where could take the proof, otherwise the act would in this respect be nugatory.

If then the justice had the power to take the proof, does it sufficiently appear to the court that he was a justice of the peace of *Montgomery* county? The only evidence of this is the certificate of the clerk of that county, and this, it has been urged, is insufficient, no act of assembly expressly warranting a certificate to be given in this particular case. The original commissions to all justices of the peace are transmitted to the respective counties for which they are appointed. They are required to assemble at the respective court-houses to take the oaths required by the constitution and the laws, one of which oaths, at least, is, by the act of 1777, required to be recorded. By whom then could their appointment and qualification be attested

sent by the officer having charge of their commissions, and the evidence on record of their qualifications? Such evidence is certainly admitted in analogous cases, by express legislation. But I consider the admissibility of this evidence as settled by the decision of this court, in the case of *M'Comas vs. Bradford's Lessee.* This cause was tried in *Harford* county court, and was brought up by appeal to this court. A copy of a lease from the agent of the Lord Proprietary, for 99 years, dated in 1744, was offered in evidence. It was proved by the affidavit of the auditor of the state, in whose office the original was deposited, to be a true copy. The affidavit was taken in *Anne Arundel* county before a justice of the peace, with a certificate of the clerk of that county annexed, that the person, before whom the affidavit was taken, was duly commissioned and sworn. This court, at December term 1813, decided that the copy was competent evidence. It will be perceived by a reference to the act of assembly of 1793, *ch.* 103, that copies of the books and papers in the auditor's office, attested by that officer, *and sworn* to by him to be true, copies were made evidence, in the same manner as if the original were produced. That case, and the present, have but one feature by which they can be distinguished. The act of 1766, I have endeavoured to show, made no designation of the officer before whom the proof should be made. The act of 1793 directed generally that the auditor should be sworn, without saying before whom, and in each case the oath is made in a different county from that in which the papers are adduced in evidence. In neither case is there any evidence to satisfy the mind, that the oath was taken before a person empowered by law to administer oaths, except the certificate of the clerk of the county where the justice resided. The feature before alluded to, which distinguishes the two cases, is that in one certificate the justice is said to be duly *commissioned and sworn*, and in the other that he was *authorised and assigned.* Since the determination in the case of *Gittings and Hall*, the expression in either certificate is sufficient, the words being considered equivalent. No other reason can be given for the determination of the case of *M'Comas and Bradford's Lessee*, than that this court considered the clerk's certificate was sufficient to prove that the person, before whom the oath was taken, was a justice of the peace; and governing in that case, it

should govern in this. An adherence to decisions, (it can scarcely be necessary to observe,) is of great consequence to the public. It would be infinitely better to adhere to a determination, from which no possible inconvenience could flow, relative to the propriety of which a reasonable doubt might be entertained, than by rescinding it, to open a door to endless litigation. I cannot but think, that the giving efficacy to this deed is of great importance to the security of those land titles which are derived through nonresident grantors. These titles are undoubtedly numerous in the state. The cases of practice under this law, which have come under my observation, have generally been conducted by counsel, and in these the proof of the powers, and the acknowledgments of the deeds, have been made in the county courts where the lands lay. What has been the popular construction and practice with regard to it, I am unable to say, but doubtlessly this deed has many intimately allied to it in the mode of proof and manner of execution. Indeed this record furnishes us with two deeds precisely of the same character, from which a deduction may reasonably be drawn that they are more numerous than at first view might be imagined.

Believing the deed sufficient on the first ground, I do not think it necessary to make any remarks on the power, which it is urged the court would have, to call in to its support the aid of presumption. So far as regards the competency of the witnesses, whose testimony is detailed in the *second* and *third* bills of exceptions, I do not deem it necessary to express an opinion; I concur with the court below in rejecting the prayers made by the plaintiff. When all objections to the competency of the witnesses, and to their credibility, were withdrawn, the plaintiff could have had the benefit of their testimony if he had pleased, and the jury were surely bound to respect it. To call on the court, under these circumstances, for the expression of their opinion as to the competency of the witnesses, was asking the court, in effect, for a mere speculative opinion, which was properly refused.

The court below were called upon, in the *fourth* bill of exceptions, to direct the jury that they might presume a deed from *Thomas French,* the patentee of the tract of land called *The Brothers,* to *James Clarke,* before the 7th of November 1785, the date of his conveyance to *Faw,*

1825.

Beall
v.
Lynn

which conveyance recited that a deed had been made by the patentee to *Clarke.* Presumption is often resorted to for the purpose of supplying defective evidence, and in this country is not oftener applied to any subject than to supply defective title to lands. It would be difficult to make out the titles to many of the elder tracts of land in this state, by a regular deduction of title deeds from the patentees down to the present proprietors, without resorting in some stage of them to presumption. Records may sometimes be lost or destroyed. Ancient title papers may be defectively executed, or the proof of them, from lapse of time, may be impossible. Yet in all these cases the possession may have been invariably in the person claiming the land, and in those from whom he derives his title. In such cases possession, which has been long and undisturbed, and which is in general the concomitant of title, induces a belief in the mind, of title little short of that which would be produced by the adduction of the most undeniable and best authenticated evidences of right. The grant of incorporeal hereditaments is often presumed from the undisturbed user thereof for a length of time. Grants from the crown, in *England*, are presumed, from length of possession, and here even proprietary grants, under certain circumstances, are presumed. In general these presumptions are bottomed upon the existence of certain facts, which can leave but little doubt upon the mind of the truth of the fact which we are called upon to presume. They frequently too, derive their force and efficacy from that vigilance with which the law guards ancient possessions, which sooner than they should be disturbed, presumes that they had in contract a rightful commencement. In this case, however, it has been strongly urged, that the possession of the plaintiff was not of such a character that a presumption could justifiably be founded upon it, and that if it were of such a character, yet that it has been rebutted by an opposing possession of the defendant, which would preclude the idea that a conveyance had been made in conformity with the prayer.

In order to lay a ground for a presumption, it certainly would not be necessary that there should have been a possession by enclosure. Were this the case, presumption need never be called in aid of title, for the statute would protect the possession without it. If one have the right in a tract of land, and possession of part, his possession of a

1825.

Beall
vs
Lynn

part is possession of the whole tract, according to the true position and location of the land. It appears from the evidence, in addition to the deeds which are contained in the record, and which were offered in evidence, that *Clarke* in the year 1782 leased the land to *Benjamin Wiley,* who lived on it eight or ten months; that in 1788 or 1789, *Wilkins* cleared a field on the land, and held it some years, always claiming title under the lessors of the plaintiff, from which period the lessor of the plaintiff, and those from whom he claimed, and under whom he claimed, have been in the actual possession and occupation of parts of the land, by cutting timber thereon, clearing land, leasing out and selling parts of it to different persons, always claiming title to the whole tract as having been purchased of *Faw.* It is unaccountable that the patentee, or his representatives, should have permitted *Clarke* to take possession of this tract of land, hold it in his possession for several years, place upon the records of the country a deed of conveyance for it, reciting too that the patentee had conveyed his title to him; that he should have permitted *Clarke* and his grantees, to remain in the quiet and undisturbed possession of this property for a period of thirty-one years, without making a single effort to dispossess them, unless we believe he had conveyed the lands: It is not pretended that any such effort ever was made on the part of the patentee. In the absence then, of such evidence, the conveyances executed by the persons in possession, the long and uninterrupted possession of *Clarke,* and those who claim under him, furnish evidence of a character sufficiently strong, upon which to build the presumption prayed for by the plaintiff's counsel in the court below. The testimony adduced by the defendant is not at all, in my apprehension, calculated to lessen the weight of those circumstances which naturally give rise to the idea of a conveyance having been made. The defendant has taken defence for *George's Adventure, Crooked Meanders,* and part of *Walnut Bottom;* whether this be from the casual interference of the lines of these tracts with *The Brothers,* or whether the tracts, when originally taken up, were laid altogether upon *The Brothers,* under the impression that it did not extend as far as now laid down, and claimed by the plaintiff, or that they were vacancies, are questions perhaps immaterial to the investigation and determination of this subject. The de-

fendant, and those from whom he claims, have been in possession of three several parcels of the land for which he takes defence, one from 1795, another from 1797 or 1798, and the third from 1799 or 1800, but he has never claimed either as belonging to *The Brothers*, but sets up a right independent of that tract, and in no way, as to title, connected with it, always contending that the just location of the plaintiff's tract would not cover his lands. His claim and pretensions, his enjoyment and possession of these lands, are in no wise inconsistent with the plaintiff's right and title to *The Brothers*, or with any presumption which may be made in aid of the plaintiff's defective title, except so far as, by the proper location they may be found to interfere. There has been no mixed possession of the tract which the plaintiff claims, but the possession of each has been of separate and independent tracts of land, by different names and different grants. Each may have a perfect title in the several tracts which they claim, so far as grants and regular conveyances alone can confer a right; but which is to have the precedence may, nay must entirely depend on a question of location, which is a question of fact for a jury alone to determine. Presumption is a question of law, and if the defendant had been sufficiently long in the possession of those tracts, for which he takes defence, there could be nothing contradictory or inconsistent in allowing to each the benefit of presumption to supply defective title papers. In such a case the determination of the question of right would be made from the seniority of their respective grants, and their interfering locations, which would have to be adjusted by the judgment of a jury from the evidence each might adduce. I therefore think the plaintiff entitled to the direction he has asked in the *fourth* bill of exceptions.

It has, however, been strongly urged, that two of the deeds upon which the plaintiff grounds his evidence, upon which to make the presumption, are defective. I believe the deed from *Faw* to *Beall*, bearing date the 24th of September 1810, good and admissible evidence, for the reasons assigned in the consideration of the question arising on the *first* bill of exceptions. The other deed from *Clarke* to *Faw*, dated the 7th of November 1785, was acknowledged before two justices of *Baltimore* county, and the clerk of that county has certified that the persons before whom the acknowledgment was made *were justices of the peace*, and

1825.

Lyles
vs
Digges

that *to all their acts as such faith and credit ought to be given.* The certificate alone is objected to, and it is said not to be in conformity with the *third* section of the act of 1766, *ch.* 14; that requires the certificate to state, that the persons before whom the acknowledgment was made were *justices of the peace, commissioned and sworn.* In the case of *Gittings & Hall,* it was determined, that the words of the act need not be pursued, but that equivalent words would be sufficient. *Faith and credit could not be given to their acts* as justices of the peace, unless they were *commissioned and sworn,* and the assertion of the former in the clerk's certificate, necessarily implies the latter, and brings the certificate within the decision in the case above alluded to. It is therefore considered, that the deeds objected to are admissible in evidence, and can form no ground to support the refusal of the court below to grant the prayer of the plaintiff.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.